Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| K.B., and R.C., <br><br> Plaintiffs, <br><br> vs. <br><br> PROVIDENCE HEALTH PLAN, <br><br> Defendant. | COMPLAINT <br><br> Case No. 4:20-cv-00123 DN |

Plaintiffs K.B. and R.C., through their undersigned counsel, complain and allege against Defendant Providence Health Plan ("Providence") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. K.B. and R.C. are natural persons residing in Josephine County, Oregon. K.B. is R.C.'s mother.

2. Providence is a health insurance company based in Oregon and was the insurer and claims administrator for the insurance plan providing coverage for the Plaintiffs ("the Plan") during the treatment at issue in this case.

1

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). K.B. was a participant in the Plan and R.C. was a beneficiary of the Plan at all relevant times.

4. R.C. received medical care and treatment at Open Sky Wilderness Therapy ("Open Sky") from March 8, 2017, to August 2, 2017, and Fulshear Treatment to Transition ("Fulshear") from August 4, 2017, to May 31, 2018. These are inpatient treatment programs, which provide sub-acute inpatient treatment to individuals with mental health, behavioral, and/or substance abuse problems. Open Sky provides treatment in Utah and Colorado and Fulshear is located in Texas.

5. Providence denied claims for payment of R.C.'s medical expenses in connection with her treatment at Open Sky and Fulshear.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because Providence does business in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"),

an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### R.C.'s Developmental History and Medical Background

9. R.C. was an introverted child and initially had trouble meeting many of her milestones. Once she started school however, R.C. performed well although she would often have intense tantrums when she returned home. As R.C. grew older she became increasingly anxious and began losing some of her long-term friends. R.C. started seeing a therapist and then a psychiatrist.

10. On September 14, 2014, R.C. was taken to the emergency room and given a psychiatric evaluation after she confessed to attempting suicide via hanging. R.C. was discovered to be self-harming via cutting and stopped participating in hobbies and activities that she used to enjoy. R.C. later revealed that her boyfriend at the time was physically and sexually abusive. On October 19, 2015, and again on December 5, 2015, R.C. was again hospitalized and placed on a psychiatric hold due to suicidal ideation.

11. R.C. had significant weight gain due to her medications and on January 1, 2016, she was once again placed on a psychiatric hold. R.C. became less compliant with her medications and on January 30, 2016, she was admitted to a treatment facility called Children's Farm Home. After her discharge, R.C.'s anxiety was still severe enough that she was unable to attend school. She started seeing a different therapist and psychiatrist and began attending an outpatient dialectical behavioral therapy program but stopped after only one month.

12. R.C. began abusing substances and again entered into an abusive relationship. R.C. frequently called her parents and asked them to take her to the E.R., resulting in many unnecessary hospital visits. R.C. expressed a desire to attend an inpatient treatment program and arranged to go to a nearby facility. However, before she was able to attend, she became very anxious and was sent to an acute hospitalization program on April 27, 2017. She was then refused admission to the facility she was initially planning to attend due to her level of acuity.

**Open Sky**

13. R.C. was admitted to Open Sky on May 8, 2017.

14. Providence denied payment for R.C.'s treatment in a series of Explanation of Benefits ("EOB") statements under codes N706 – F53, "Closed. Refer to separate letter requesting additional information or additional explanation messages for final claim status" and N130 – (DNA), "Deny due to No Authorization"

15. In a letter dated February 7, 2018, K.B. appealed the denial of R.C.'s treatment. K.B. contended that coverage was available under the terms of the Plan for the treatment R.C. was receiving. She noted that in the event that preauthorization was not obtained, the Plan only allowed for a 50% penalty, not to exceed $2,500 be imposed. She wrote that the Plan did not allow for a complete denial of benefits. K.B. included a copy of R.C.'s medical records and claims with the appeal.

16. In a letter dated March 2, 2018, Providence upheld the denial of payment for R.C.'s treatment. The letter gave the following justification for the denial:

> The criteria "Residential Rehabilitation-Mental Health Conditions" provide coverage for this level of care when one or more of the following criteria have been met:

4

- The member is not in imminent or current risk of harm to self or others and/or property
- Co-occurring behavioral health or physical conditions can be safely managed

If these criteria have been met, treatment continues until the "why now" factors which led to treatment, have been addressed to the extent that the member can be safely transitioned to a less intensive level of care or no longer requires treatment.

The clinical information provided was not clear if the residential mental health treatment level of care was medically indicated. It does not appear that [R.C] required 24 hour monitoring of her medical and or psychiatric treatment. Specifically there is no evidence that she was acutely suicidal, with intent or plan, homicidal, acutely psychotic or gravely disabled and a secure therapeutic setting to assure safety was not required. Her care could have safely been provided in a less restrictive setting, such as at the partial hospitalization level of care. Therefore, we are unable to comply with your request to approve residential mental health treatment at Open Sky from May 8, 2017 through August 2, 2017.

17. On July 12, 2018, K.B. requested that the denial of R.C.'s treatment be evaluated by an external review agency. K.B. referenced the medical necessity of R.C.'s treatment at Fulshear, the denial of which had been partially overturned following her appeal.[1] She stated that logically if the treatment at Fulshear, which occurred directly after R.C.'s treatment at Open Sky, was deemed to be medically necessary then the treatment at Open Sky which preceded it should have also been found to be medically necessary.

18. K.B. argued that while the criteria used to evaluate the claim was ostensibly Optum's medical necessity criteria, these criteria had been misapplied to focus primarily on acuity of symptoms. She stated that this was done in spite of the requirement that patients not be a danger to themselves or others to receive residential treatment care. She asserted that R.C. met all of the Plan's criteria for the medically necessary treatment she received.

19. K.B. contended that this application of acute level requirements such as being suicidal, homicidal, or psychotic in order to receive subacute mental healthcare violated MHPAEA

---

[1] See paragraphs 24-27 below

as no such requirements were imposed on analogous levels of medical or surgical care such as skilled nursing or rehabilitation facilities.

20. K.B. asked to be provided with a full, fair, and thorough review by an appropriately qualified reviewer who took into account all of the information she provided. K.B. wrote that it was apparent from R.C.'s history that her life was at risk outside of the confines of a facility like Open Sky and that the "vicious cycle of acute stabilization and subsequent regression in outpatient care was simply unsustainable…"

21. K.B. argued that R.C. clearly met the Plan's criteria for the inpatient treatment she was receiving. She argued that lower levels of care had clearly proven to be ineffective and that it was only through R.C.'s treatment at Open Sky that she had been able to show progress.

22. In a letter dated August 16, 2018, the external review agency upheld the denial of payment for R.C.'s treatment. Among the guidelines noted to have been utilized by the reviewer were "Criteria for Short-Term Treatment of Acute Psychiatric Illness" from the American Psychiatric Association. The reviewer wrote in part:

> …The Residential Mental Health Treatment at Open Sky from May 8,2017 [sic] through August 2, 2017 was not medically necessary. The claimant was not suicidal, homicidal, or gravely impaired for self-care. She was not disturbed in thinking/behavior to require around the clock nursing supervision. No demonstrably medically necessary psychiatric interventions were planned, proposed or in place which could not be carried out safely and effectively at a less intensive level of care. …

**Fulshear**

23. R.C. was admitted to Fulshear on August 4, 2017.

24. Providence Health Plans initially denied payment for R.C.'s treatment from her admission forward. In a letter dated August 8, 2017, the justifications for denying care

included R.C. having made progress, as well as "[y]ou are not a danger to yourself or others" and "[y]ou are not experiencing command hallucinations."

25. On January 26, 2018, K.B. appealed R.C.'s treatment between her admission on August 4, 2017, and October 31, 2017. K.B. contended that Providence had utilized the incorrect criteria to evaluate R.C.'s treatment and wrote that it was inappropriate to deny treatment based on things such as a lack of command hallucinations or the fact that R.C. made progress in treatment. K.B. expressed frustration at "the level of disregard" Providence showed for the severity of R.C.'s mental illnesses.

26. K.B. contended that Providence was imposing a nonquantitative treatment limitation in violation of MHPAEA by requiring R.C. to exhibit acute symptoms for a sub-acute level of care. K.B. quoted the Plan's residential treatment criteria and argued that R.C. met these requirements and she was at significant risk of relapse without continued care. She also pointed out that the Plan's criteria for residential treatment and acute inpatient care were nearly identical despite the fact that the two were "vastly different levels of care."

27. In a letter dated February 8, 2018, Providence overturned the denial of payment for R.C.'s treatment at Fulshear from August 2017, through the end of October 2017. Providence denied payment for treatment from November 1, 2017, forward in a series of Explanation of Benefits statements on the grounds that preauthorization was not obtained.

28. On July 11, 2018, K.B. appealed the denial of payment at Fulshear from November 1, 2017, forward. She stated that it was clear from the fact that Providence reversed its adverse decision for R.C.'s prior treatment that a lack of preauthorization was not an appropriate justification for the denial.

29. K.B. explained that while Fulshear had both a residential treatment level of care as well as a transitional level of care, R.C. had been receiving uninterrupted treatment at Fulshear and was never readmitted to the program, and so it was improper to require her to satisfy the admission requirements once again. She challenged Providence to identify in the terms of the Plan where a continuation of care within the same facility required preauthorization. She then pointed out that even in the event preauthorization was not obtained, the Plan did not allow for a full denial of benefits, but instead imposed a maximum penalty of $2,500.

30. In a letter dated August 14, 2018, Providence denied payment for R.C.'s treatment from November 2, 2017, forward. The letter gave the following justification for the denial:

> The residential mental health treatment at Fulshear Ranch Academy was approved by PBH until November 1, 2017 as the clinical information provided indicated that [R.C] required treatment of this intensity. However, beginning November 2, 2017 the information provided did not indicate that she required treatment of this intensity. It appears that her condition had stabilized.  Specifically there is no evidence that she is acutely suicidal, with intent or plan, homicidal, acutely psychotic or gravely disabled and a secure therapeutic setting to assure safety is no longer required. She no longer requires 24 hour monitoring and her care can safely be provided in a less restrictive setting, such as at the Intensive [sic] outpatient Program [sic] setting. Therefore, we are unable to comply with your request to approve continued residential mental health treatment at Fulshear Ranch Academy beginning November 2, 2017 as criteria for coverage of this level of care were no longer met.

31. On January 22, 2019, K.B. requested that the denial of R.C.'s treatment at Fulshear from November 1, 2017, through May 31, 2018, be evaluated by an external review agency. K.B. pointed out that during this timeframe R.C. was participating in the transitional care program at Fulshear and was no longer in the residential program, yet Providence's denial letter did not appear to recognize this distinction. K.B. also stated that Providence's denial listed the incorrect dates of service.

32. K.B. wrote that while it may have been true that R.C. was stabilized, that did not mean that she did not require further treatment. K.B. requested that the review be assigned to an appropriately qualified reviewer with a specialization in R.C.'s diagnoses. K.B. expressed disappointment with the "improper and faulty reviews" she had so far received from Providence which, among other things, improperly evaluated R.C.'s subacute treatment under an acute standard of care.

33. K.B. wrote that R.C.'s treatment was consistent with the Plan's definition of medical necessity and argued that without the care she was receiving at Fulshear, R.C. would have likely required additional hospitalization. She wrote that R.C. was receiving treatment in the "type, frequency and duration" that was consistent with the recommendations of her treatment team as well as scientifically based guidelines.

34. K.B. included a copy of R.C.'s medical records as well as letters of medical necessity with the appeal. These records showed R.C.'s continuing problems with anxiety, panic attacks, negative self-image, and unhealthy relationships.

35. After K.B. received no response to her external review request despite the fact that it was confirmed to have been delivered via certified mail on January 28, 2019, K.B. resubmitted the external review request on March 6, 2019.

36. In a letter dated March 15, 2019, Providence Health Plan upheld the denial of payment for R.C.'s treatment on the grounds that the appeal was untimely. The letter stated in part:

    > Our records indicate that the first level appeal decision was sent to you dated August 14, 2018, informing you that if you disagreed with the denial, you or your representative one hundred and eighty (180) calendar days to file an appeal. [sic] We are sorry to inform you that the time frame to appeal the denial has passed Please see the enclosed Grievance and Appeal Rights for additional information.
    >
    > You or your representative may submit a written explanation why you did not appeal the denial within the specified time frame.  In certain situations, we may

      extend the time limit. You must submit your written explanation within 30 calendar days from the date listed of this letter if you believe your situation would qualify for an exception to the time limit.

37. On April 11, 2019, K.B. sent a letter to Providence stating that her external review request had been submitted well within the 180 day timeframe allowed by the Plan. She stated that she was not aware of any issues with the appeal until a follow up call to Providence on March 6, 2019. She wrote that it was at that time that she noticed an inadvertent error, while her appeal request was sent to the correct address, it was accidentally sent to P.O. Box 4148 instead of the proper number 4158.

38. She stated that Box 4148 belonged to another third-party health insurer "that partners directly with Providence." She noted that she was never informed of this addressing error and had no reason to believe that her appeal request had not been delivered to the correct address. She asked Providence to process her external review request given these circumstances.

39. In a letter dated April 22, 2019, Providence Health Plan refused to process K.B.'s external review request. The letter stated in part:

> After a thorough review of your concerns, it has been determined that PHP is unable to comply with your request for further review of the above-mentioned claims. While we are very sympathetic to your situation; unfortunately, your written explanation did not meet the Plan's criteria as an unforeseen urgent or emergent circumstance. This is the final decision by PHP. We apologize for any inconvenience that this may cause you.

40. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

41. The denial of benefits for R.C.'s treatment was a breach of contract and caused K.B. to incur medical expenses that should have been paid by the Plan in an amount totaling over $136,000.

## **FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

42. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Providence, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

43. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

44. Providence and the agents of the Plan breached their fiduciary duties to R.C. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in R.C.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, and to provide a full and fair review of R.C.'s claims.

45. The actions of Providence and the Plan in failing to provide coverage for R.C.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## **SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

46. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

47. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

48. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

49. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

50. The medical necessity criteria used by Providence for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

51. In addition, the level of care applied by Providence failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing

Case 1:21-cv-00547-CL   Document 2   Filed 10/30/20   Page 13 of 16

decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

52. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for R.C.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Providence exclude or restrict coverage of medical/surgical conditions by imposing acute care requirements for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

53. In its review of R.C.'s claims, Providence's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that R.C. received. Providence's improper use of acute inpatient medical necessity criteria is revealed in the statements in Providence's denial letters such as "there is no evidence that she was acutely suicidal" or denial of payment on the grounds that she was not "acutely psychotic or gravely disabled"

54. These references to acute requirements for a sub-acute level of care are repeated and explicit and constitute a nonquantitative treatment limitation that cannot properly be applied to evaluate the sub-acute level of care that R.C. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

55. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-

13

acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

56. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

57. When Providence and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. Providence and the Plan evaluated R.C.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

58. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Providence, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

59. The violations of MHPAEA by Providence and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendant violate MHPAEA;

    (b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of its violations of MHPAEA;

    (e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

    (f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

    (g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

    (h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

60. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for R.C.'s medically necessary treatment at Open Sky and Fulshear under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 30th day of October, 2020.

By    <u>s/ Brian S. King</u>
      Brian S. King
      Attorney for Plaintiffs

County of Plaintiffs' Residence:
Josephine County, Oregon